All right, our fourth case for this morning is United States against Charles Wechsler, 2025-72. And we should have, and I'm not sure we have everybody yet, we should have Mr. Minch and Mr. Wood. And I see Mr. Minch, so let's wait a minute and see if we can get Mr. Wood into the group. Thank you, your honors, and may it please the court. My name is Theodore J. Minch, and I am from the law firm Sovich Minch LLP in Indianapolis, Indiana. And I represent Charles Devon Wechsler in the appeal of his sentence in this matter. Mr. Wechsler, and I'll be very brief, your honors, because essentially briefings in this matter, we believe, fairly well summarizes and outlines the arguments that we are making here today. Essentially, Mr. Wechsler had pled guilty- So can I just ask you, Mr. Minch, what's the status of the sentencing transcript? Your honor, I believe the sentencing transcript, and I apologize, your honor, for not designating that initially as part of the record. I don't wanna get into too much detail, but essentially- No, no, you don't need to file that. I just wondered if it's here yet or about to be here. I had communicated with the court reporter in the matter, and she was going to designate it as a CJA billing. I'd been in communication with her. I thought that had happened. I apologize that it's not there yet. And again, I will inquire with her, but she and I had exchanged several emails, and she did provide me with a copy of the certified transcript. Excellent, okay, so we're on track. Okay. Yes, thank you, your honors. So essentially, the issue really is Mr. Wexler was sentenced to the low end of the guidelines, 87 months. He pled guilty, open to the court, essentially, which preserved his right to appeal in this matter, and that was very important, obviously, to Mr. Wexler. Just a few of the things that I would ask the court to give consideration to in this matter and from our briefings, is that Mr. Wexler is an individual who had very limited criminal histories, can be seen from the criminal history points that he received as part of his sentencing. We don't have any quarrels with the calculations, nothing of that nature. Essentially, Mr. Wexler, from the moment, literally, that he was released from custody in this matter, initially, pending trial or pending case disposition, Mr. Wexler sought out and began treatment with Dr. Johnson, who was really, in Indiana and in our district, is the preeminent expert in treating for both on behalf of the state of Indiana and other governmental agencies and individuals like Mr. Wexler themselves, individuals that are faced with the types of backgrounds, histories, mental health issues that all relate to the charges that Mr. Wexler was faced with in this case, which was the possession of child pornography. Mr. Wexler treated with Mr. Johnson, literally, on an every week basis. That testimony from Mr. Johnson was clear in the sentencing presentation that we made on behalf of Mr. Wexler. So, but Mr. Mintz, what is wrong with the district court, Judge Hanlon's explanation that despite these positive factors for Mr. Wexler, there were certainly negative factors. The nature of the conduct was extremely serious. The court was not satisfied that this static 99 tool was the correct one to use under these circumstances. And so we let the district courts balance these kinds of things. And you would have to convince us that the ultimate result was just so far outside the range of rational choice that we should brand it an abuse of discretion and sentence him ourselves almost. Your Honor, in essence, it is absolutely is an uphill battle for Mr. Wexler. Mr. Wexler understands that. And we do believe, and I wanna be very careful about how I parse this argument, because we don't quarrel with anything the Honorable Judge Hanlon did in terms of giving Mr. Wexler the proper weight or the activity being engaged in voluntarily, giving that the proper weight that we believe that it deserved. It's our argument that, and I think that the government essentially touched on this in their brief and their competing brief in opposition to our sentencing memorandum is that the static 99 test is not the proper test for this particular activity or this particular offense that Mr. Wexler or activities that Mr. Wexler had been engaged in. But our quarrel with that is that Mr. Wexler sought out whom he believed and by all accounts was the preeminent expert in this area, treated with him, underwent the static 99 test. And from our understanding, and in fact, the government's understanding as we read their briefs and their pleadings at the trial court level is that there is no other test that Mr. Wexler could have engaged in to accomplish what he was seeking to accomplish, which was to demonstrate that the likelihood of re-offense was extraordinarily low. And I think Dr. Johnson in his report put it somewhere at less than 1%. And obviously Judge Hanlon could choose to accept that particular finding or not, but the fact that it was given so low weight as Judge Hanlon, that Honorable Judge Hanlon acknowledged in the sentencing, in his pronouncement of sentencing, we believe is an error and we believe it should have been given greater weight because essentially Mr. Wexler did everything he could possibly do to, while he was out pending disposition of this case, to ensure that he was receiving not only the proper treatment, but that he was also being evaluated to determine whether this is conduct that was likely to repeat itself. And we believe that the court should have given more weight to the static 99 test as it was, being really the only test that could have been given under these circumstances. So that's our argument. It really is a weight argument, Your Honor. And I do understand it is an uphill battle. There's no doubt about that. Mr. Wexler understands it, but given the two years of treatment that he received ongoing on an every week basis, coupled with the fact that he sought out literally what we believe and what we understand to be the only test of its nature of its kind, essentially should be given more weight than the trial court had given it. All right. We'll try to get a reduced sentence or what's the remedy? Yes, Your Honor. And we do, again, it's a very difficult argument because he was, the Honorable Judge Hanlon did sentence Mr. Wexler at the low end of the guidelines. We acknowledged that it was an 87 month sentence, but that is in essence what we're attempting to achieve is a reduced sentence that gives proper weight to the likelihood that Mr. Wexler would re-offend. And additionally, we give proper weight to the fact that there just really wasn't anything else that Mr. Wexler could have done pending disposition in this case, Your Honor. We thank you very much. And we would, without further questions, we would conclude our initial presentation on that basis. All right. Thank you very much. Mr. Wood. Thank you, Your Honor. Your Honor, Bob Wood on behalf of the United States. The court should affirm, unless the court has a lot of questions, I don't intend to take much time. As Mr. Wexler and his counsel seem to acknowledge, Judge Hanlon was thoughtful here and used his discretion. He could have used his discretion in assessing this scientific evidence, however he saw fit. And he credited Mr. Wexler for his efforts, but weighed a bunch of factors together and made a reasonable decision. And unless there are questions, the government would rest on its briefs as to that point. Mr. Wood, on the use of the Static 99, this is one of these actuarial tools. As I understand it, there's a variety of actuarial tools that can be utilized by corrections officials, probation, parole agents to assess risk, assess possibility of future drug use. There can be a variety of different issues. The Static 99 does seem to be based upon sex-related crimes. Was there a more precise tool that should have been used by this physician or by this doctor? Or is the objection that an actuarial tool in general is not gonna be that helpful? So the argument, at least for appellate purposes, our argument now is that it was within the judge's discretion to bring that actuarial tool to bear in the way he did, or he could have used his discretion  this is the best thing available. I'm going to take a different nuanced view of this. There is not in the government's, from the government's understanding, a more proven reliable test at this point. There are tests that are undergoing increased study and application to sample sets. But my understanding in this area is that there is not a better test. But that there is not a better test does not mean ipso facto that the Static 99 is a good test. It may be an okay test, but I think that the better view is the one the judge took. It's fair that Dr. Johnson used the only test at his disposal, but I'd prefer to credit his observation, all of his other observations, when his own testimony said that, and this is how the judge put it, Dr. Johnson said this is not validated for this particular narrow set of non-contact sex offenses. So again, I'm not aware of, and I've looked into this with the trial USA, of another test that has a robust measurement and evidence and body of scientific study behind it at this point. I think they're on their way, but it's not about one test versus another. And that's why the government didn't present a test to a substantial degree, but that doesn't in turn mean that this test was reliable. Thank you, that answers my question, thank you. Unless there are other questions, the government will rest on its briefs. Thank you, your honors. Thank you. Anything further, Mr. Minch? Thank you, your honor. I'll be very brief, and I just wanted to respond to the question that Justice Brennan had. With regard to the Static 99 test, the irony, as I understand it, again, I'm not an expert in the field, so I rely upon what Dr. Johnson's had to say and what other research I've been able to do, but certainly does not qualify me as an expert. The frustrating part about the Static 99, as I understand it, is that the test appears to be very fit and right on point where you have sexual misconduct that involves actual touching or contact, and I don't think I'm misstating that. And because this case didn't involve that, as ironic as it is, because obviously it's a lesser offense in terms of seriousness, and again, I don't want to mean to diminish the seriousness of Mr. Wexler's actions, but again, he attempted to obtain whatever test was out there, ironically, and I don't want to get too deeply in the woods because this is not in the record, and I do understand that, but I had understood from Dr. Johnson that most recently there is a test that they are experimenting with, and I think Mr. Wood was exactly right. I think they're in the development phase. It would have been a test that Mr. Wexler absolutely would have participated in, I think from his prior conduct while he was released in this case, pending disposition, demonstrates that there's no doubt he would have taken the test that was available. Unfortunately for Mr. Wexler, that test for Mr. Johnson wasn't available until literally days just after he was remanded to the Bureau of Prison, so we don't have a competing test, and we don't really have anything other than the static 99 to compare and to evaluate, and so, your honors, in summary, we're just asking the court to afford the only test that Mr. Wexler could have taken, the proper way that we believe it was due, and adjust his sentence accordingly. Thank you very much for your time this morning. Thank you. Thank you very much. Thanks as well to Mr. Wood, and I should have noted this actually in one of our earlier cases, that you were appointed, I understand, at Mr. Minchin. We appreciate your efforts on behalf of your client and for the court. We will take this case under advisory. Thank you so much, your honors. It's always a pleasure. Thank you.